SEFFENS, Appellant, vs. CARISCH, Executor, Respondent.

*April 7—May 11, 1926.*

*Insurance: Person in possession of policy: Presumption: Change of beneficiary: By-laws of association: Use of wrong blank or form: Waiver by insurer paying money into court: When equity will decree change of beneficiary.*

1. The evidence in this case is *held* to justify the trial court in setting aside a jury finding that one in possession of an insurance policy acted as the agent of his mother-in-law, the beneficiary, in withholding it from the insured, who wished to change the beneficiary.  p. 152.

2. One who is in possession of a benefit certificate and a note of the insured is presumed to have come by them lawfully. p. 154.

3. The withholding of the benefit certificate from the insured is *held* not to have delayed the application for a change of beneficiary or prevented the issuance of a new certificate before the death of the insured. p. 157.

4. The insured in a mutual benefit association must change the beneficiary in the manner required by the policy and the rules of the association, and any material deviation from such course will render the attempted change ineffective. p. 157.

5. An insured in good standing in a mutual benefit association who made application for a change of beneficiary on the form provided for one whose certificate had lapsed, instead of the proper form, which contained an agreement under which the association could recoup itself for the damages sustained on a lost certificate, is *held* not to have complied substantially with the by-laws, and to have justified the association in refusing to change the beneficiary. p. 160.

6. Mutual benefit associations cannot be regarded as having waived the requirements of the by-laws as to a change of beneficiary by paying into court the fund due on the benefit certificate. pp. 163, 164.

7. Where the insured in a mutual benefit association does everything in his power to effect a change of beneficiary and the only remaining requirement is the performance of a ministerial act by the association, or where there is unreasonable delay or collusion with beneficiaries by the association, or where the necessary certificate is wrongfully retained by the original beneficiary, equity will decree a change. p. 163.

APPEAL from a judgment of the circuit court for Trempealeau county: R. S. COWIE, Circuit Judge. *Affirmed.*

The Modern Woodmen of America is a fraternal beneficiary society organized under the laws of the state of Illinois and has its principal office at Rock Island. It has a lodge system with ritualistic form of work, and representative form of government, as is defined in the statutes of this state, and it is duly licensed to transact business in this state. The contract between the organization and a member

thereof consists of the by-laws of the organization, the application for membership, and a benefit certificate.

One J. H. McKenney, a resident of Osseo, Wisconsin, became a member of said organization in 1888, and continued such membership until the time of his death on April 27, 1925. In 1904 his certificate was made payable to Mary L. McKenney, his second wife. The plaintiff is the grandson of J. H. McKenney and his only blood relative. In the spring of 1924 Mary L. McKenney, in order to obtain relief from a cancerous affliction, was operated upon with apparent success, but her health was not completely restored, so on or about Christmas time of the same year she went to California, where she remained for about three months, returning to Osseo some time in March, 1925. As her husband at that time was about seventy-seven years of age and unable to give her the personal attention which she required, she took up her abode with her daughter, Mrs. Carisch, at River Falls. After this time she was again operated upon at Eau Claire, and thereafter, up to the time of her death, resided at River Falls, where she died on the 19th day of May, 1925. J. H. McKenney and Mary L. McKenney had no issue, but Mary L. McKenney left her surviving children by a former marriage.

In April, 1925, McKenney's certificate in the Woodmen was in the possession of the defendant, *E. B. Carisch,* at River Falls, and McKenney at that time concluded to appoint the plaintiff as the beneficiary under the certificate in place of his wife. Since the year 1921 the Woodmen had adopted certain by-laws which contained provisions under and pursuant to which a member could change the beneficiary in his policy, and among other provisions are the following. Sec. 52 provides:

"Any member in good standing who desires to make a change of beneficiary, shall execute the surrender clause on the back of his benefit certificate, designate therein the

change desired and deliver the certificate, together with a fee of fifty cents, to the camp clerk."

Sec. 53 provides:

"In case a benefit certificate is lost, destroyed or beyond the member's control, he may, in writing on forms furnished by the head clerk, waive all claims thereunder, designate the same or a smaller amount of benefits, and have a substitute certificate issued by filing the said waiver with and paying to his camp clerk a fee of fifty cents. . . . No change of beneficiary shall be effective until a new certificate shall have been issued in the lifetime of the member, and until such time the provisions of the old certificate shall remain in force."

The Woodmen also in its by-laws adopted certain forms to be used by members where a change in beneficiary is desired, and among such forms are those known as Form No. 7½ and Form No. 7. Form No. 7½, the use of which is designed for members whose certificates have lapsed, reads as follows:

*"Waiver of Lost Certificate.*

"To the Head Camp, Modern Woodmen of America:

"I, —— ——, certify that I formerly held beneficial membership in ——, Camp No. ——,

Modern Woodmen of America,

located at ——, state of ——.

"I further certify that the benefit certificate for $—000 which I held prior to the termination of my membership by lapsation has been lost or destroyed; that strict search fails to discover the same, and that I am, therefore, unable to surrender it as required by the laws of Modern Woodmen of America; that I have not transferred or assigned said benefit certificate to any person or persons and that it is not to my knowledge held by any other person.

"In consideration of the delivery to me of a new benefit certificate, I hereby waive for myself, my beneficiary, or beneficiaries, all and severally, named in said former benefit certificate, all rights or benefits which may have accrued, or may now exist, under said benefit certificate, and which I

hereby declare to be null and void, together with any and all other benefit certificate that may at any date prior hereto have been issued to me by the said Modern Woodmen of America, and I further agree to accept the new benefit certificate applied for in lieu thereof, and should said former certificate, or certificates, be found, I shall return same to the clerk of my Camp for surrender to and cancellation by the said Society, Modern Woodmen of America.

"Witness my hand, at ——, state of ——, this —— day of ——, 192—.

"——— ———.
"Signature of Applicant."

Form No. 7, designed for use by members in good standing and who desire to change the beneficiary, reads as follows:

"*Waiver of Lost Certificate.*

"To the Head Camp, Modern Woodmen of America:

"I, —— ——, hereby certify that on this date I am a beneficial member, in good standing, of —— Camp No. ——,
Modern Woodmen of America,
located at ——, state of ——; that a benefit certificate bearing No. ——, for the amount of $—000, was issued to me by the said Modern Woodmen of America; that said benefit certificate was the last benefit certificate issued to me by the said Modern Woodmen of America; that said benefit certificate was thereafter delivered to me, is now in force, and is payable, in the event of my death, as follows:
$—— to —— —— (beneficiary), —— (residence), state ——.

"I hereby certify that it is not within my power to surrender said benefit certificate, for the reason that same ——, under the following circumstances, to the best of my knowledge, viz.: ——; but I affirm that I have not transferred or assigned said benefit certificate to any person or persons, and that said certificate is not held or controlled by any person or persons, with my consent, except as above stated.

"In consideration of the issuance and delivery to me of a new benefit certificate for $—000, payable as follows: $—— to —— —— (beneficiary), —— (residence), state

Seffens v. Carisch, 190 Wis. 144.

of ———, relationship, ———. I hereby certify that all rights
and benefits which I have heretofore claimed, which I may
now have, or which may in the future accrue under any bene-
fit certificate heretofore issued to me by said Modern Wood-
men of America, and I declare and agree that the certificate
last heretofore issued to me by the said Modern Woodmen
of America shall become and be null and void from the
date the new certificate, hereby applied for, shall be issued
by the head clerk, if such new certificate shall be so issued
during my lifetime. I hereby apply for and agree to accept
in lieu of said certificate last heretofore issued to me, the
new benefit certificate hereby applied for, and should any
benefit certificate heretofore issued to me be recovered, I
agree to return and surrender same to the head clerk of the
Modern Woodmen of America, and, further, in the event
the Modern Woodmen of America shall suffer loss by reason
of any claim being made under any benefit certificate hereto-
fore issued to me, I agree that the said Modern Woodmen
of America may reserve and retain a sufficient sum from
the amount due my beneficiary or beneficiaries, under any
benefit certificate hereafter issued to me, and in force at
the time of my death, to fully indemnify and protect it. I
agree that the new benefit certificate hereby applied for shall
be issued on and in consideration of my application for
membership and benefits, and that said application, as it may
be affected by the by-laws of the Society now in force, shall
be the basis of and the consideration of the issuance and
delivery to me of such new benefit certificate.

"Witness my hand at ———, county of ———, state of ———,
this ——— day of ———, 19—.

"——— ———.

"Signature of Member.

"I certify to the genuineness of the signature above
written and that the petitioner, Neighbor ——— ———, is a
beneficial member in good standing in this Camp on the day
and year last above written, and I agree that if the benefit
certificate for which this instrument is a waiver shall come
into my hands at any time in the future, I will promptly
return same to the head clerk.

"——— ———,

"Clerk Camp No. ———."

On the 15th of April, 1925, the defendant, *Carisch,* had in his possession the benefit certificate in question and a note for $2,000 executed by him to Mr. McKenney. In order to obtain possession of this note and certificate McKenney wrote to *Carisch* a letter on such day, in which he requested him to send these documents to the Farmers' Exchange Bank of Osseo, which letter will be further commented upon and referred to in detail in the opinion. On the 17th of April, *Carisch,* in reply to McKenney's letter of date of April 15th, stated that he would send the requested documents by Monday or Tuesday of the following week; that he had written for statements of the necessary expenses incurred for Mary L. McKenney, and that when he received such statements he would indorse the amounts on the note above referred to. Not having received the documents at the time stated in *Carisch's* letter, McKenney applied to one Smith, the clerk of the local camp of the Woodmen at Osseo, in order to effect a change of beneficiary in the certificate, and on the 23d day of April, 1925, McKenney signed an application to the head clerk upon the form known as No. 7½. This application was thereupon transmitted to the head clerk at Rock Island, together with the necessary fee, but, being executed upon a form not applicable to the situation, the head clerk returned the fee, together with a blank form known as No. 7, to the local clerk, requesting such clerk to cause the same to be executed and transmitted to him in due time, but when the new form arrived at Osseo, McKenney in the meantime had died.

It appears from the evidence that on or about the 23d day of April McKenney was taken ill with pneumonia and that he died on the 27th of the same month. The plaintiff thereupon executed proofs of death and caused them to be submitted to the head office at Rock Island, and Mary L. McKenney did likewise, and shortly thereafter the plaintiff commenced an action against the Woodmen to recover the

amount of the certificate. The Woodmen paid the proceeds of said certificate into court and was discharged from further liability, and *E. B. Carisch,* as executor of the will of said Mary L. McKenney, was thereafter substituted for said Modern Woodmen of America as party defendant.

Certain issues of fact were submitted to the jury on a special verdict, and the questions so submitted, and the answers returned, are as follows:

"(1) Was the insurance policy withheld from the deceased, J. H. McKenney? *A.* (By the court). Yes.

"(2) Was said policy withheld from said J. H. McKenney by *Emil B. Carisch? A.* (By the court). Yes.

"(3) Was said *Emil B. Carisch* acting as the agent of Mary L. McKenney in so withholding said policy? *A.* Yes.

"(4) Did the withholding of the policy delay the making of the application for change of beneficiary? *A.* Yes.

"(5) Did the withholding of the policy prevent the issuance of a new certificate before the death of said J. H. McKenney? *A.* Yes."

After verdict the court changed the answers to questions 3, 4, and 5 from "Yes" to "No," and ordered judgment directing the sum of $2,000 thus paid into court, and costs, to be paid to the defendant; and, judgment having been entered accordingly, plaintiff has prosecuted this appeal. Further facts will appear in the opinion.

For the appellant there was a brief by *J. Reese Jones* of Osseo and *Ole J. Eggum* of Whitehall, and oral argument by *Mr. Jones.*

For the respondent there was a brief by *Linderman, Ramsdell & King* of Eau Claire, and oral argument by *G. O. Linderman.* ·

DOERFLER, J. As answer to the third question of the special verdict the jury found that *Carisch* was acting as the agent of Mrs. McKenney in withholding the certificate. The court set aside the answer of the jury to this question upon

the ground that there was no credible evidence to sustain such answer. We have carefully reviewed the evidence and are satisfied that the action of the court was fully warranted. *Carisch* was the husband of Mrs. McKenney's daughter. No unpleasant relations existed between McKenney and *Carisch*. McKenney had arrived at the age of seventy-seven years, and it is natural to presume that business dealings had become somewhat distasteful to him. While he had been a member of the Woodmen since 1888 and had served in the capacity of a local clerk, he evidently did not discover that the document which he signed on Form No. 7½ was not the proper form. Smith, the local clerk, testified that he read the document to him and that he understood it and signed it, and yet it appears on the face of the document itself that it is designed for a change of beneficiary and a reinstatement into the order in a case where the certificate had lapsed for either nonpayment of dues or for some other reason.

Mrs. McKenney had been an invalid for about one year, suffering from a distressing and fatal malady. She had sought relief in hospitals and by operations, in vain. She had taken an extensive trip to California in an effort to recuperate her health, but without avail. When she returned to Osseo, some time in the month of March, 1925, after her California trip, it was realized that her condition was hopeless. She could not remain in Osseo because her husband could not give her the necessary attention and assistance, and therefore she sought refuge in the home of her daughter, Mrs. Carisch, at River Falls.

It is claimed by the plaintiff that some time before Mrs. McKenney left Osseo the certificate and the note disappeared, and it is strongly intimated that Mrs. McKenney, or some one else for her, wrongfully abstracted these documents, had them taken to River Falls, and delivered to *Mr. Carisch*. *Carisch* himself testified that he received them for safe-keeping, and the evidence in the case is conclusive

that his testimony upon this subject is in accordance with the truth. It is true that Mrs. McKenney knew that *Carisch* had these papers in his possession, but there is no evidence whatever that would justify a conclusion, or even an inference, that he held them as her agent, or that she gave any directions whatsoever to him with respect thereto. Here it must be borne in mind that Mrs. McKenney at that time had suffered the ravages of a fatal disease for a period of about one year; that her condition gradually became worse, and that she was rapidly nearing her end. Under such circumstances it can readily be assumed that Mrs. McKenney, who had up to that time, so far as the record shows, borne a spotless reputation, was not engrossed upon the commission of an act which would have a tendency to create dissension between herself and her husband, with whom she had lived happily for many years.

There is evidence in the case that when Mrs. McKenney, together with Mrs. Carisch, stopped at the McKenney home in Osseo for the last time, for a day or two, which was some time in March, 1925, McKenney signed a document which manifested an intention to transfer the certificate to *E. B. Carisch,* with the understanding that Mrs. Carisch would take care of the old gentleman for the rest of his life if it became necessary. This was testified to by Mr. Anderson, and the document, which was identified by him and which bears his signature as a witness, was introduced in evidence and reads as follows:

*"To Whom It May Concern:*

"I, J. H. McKenney, wish to have my Modern Woodmen policy changed to *Mr. E. B. Carisch,* River Falls, Wisconsin, providing that he will advance me money for the care of my wife and myself when it is necessary."

                            "(Signed)       J. H. McKENNEY.

"Witnesses: *C. B. Carisch,* Peter Anderson."

*Carisch* testified that the certificate and the note were handed to him at River Falls by his son. *Carisch* being in

possession of this certificate and also the note, the presumption is that he came by them lawfully. A short time previous to his death McKenney visited his wife at River Falls, and during such visit the possession of the certificate and of the note by *Carisch* was not discussed, and no demand at that time was made for the surrender of these documents.

On April 15, 1925, Mr. McKenney wrote the following letter to *Mr. Carisch:*

"Osseo, Wisconsin, April 15, 1925.

"Dear Friend Emil: You may think that it is strange of me to make this request of you: That is, that you send my note and Woodmen policy to me. I am sure that if nothing happens to you—if something should happen I have nothing to show that there was coming to me. I see that you tried hard to keep 'Weltha [Mrs. Carisch] quiet but she does not listen to you. I think she makes a big mistake by not doing as you tell her. Now I am going to insist that you send them to the Farmers' Exchange Bank for me and I will report all indorsements. I will have them do it for me so it will be done right. I suppose it will bother you to read this as I cannot see what I am writing. If you think that I do not indorse or have it done as it should be, you can tell me. I don't want to do business—Weltha, so please send my papers—I am sure that.

"As ever, your        J. H."

In this letter Mr. McKenney seems to be somewhat troubled, principally because the note of $2,000 of *Mr. Carisch* was in his possession, and that if anything should happen to *Carisch* McKenney would have nothing to show for his indebtedness. This letter clearly shows that Mc-Kenney knew who had possession of his papers, and he also clearly indicates the purpose of this possession. The reason for delivering the note is apparent, for it speaks of indorsements to be made thereon, which clearly corroborates *Mr. Carisch's* testimony that he held the note so that when he made payments for either Mr. or Mrs. McKenney the

indorsements could be properly made.   He even suggests that when the note is returned, either he or the bank would be able to make the proper indorsements, or, if there were any difficulty, *Carisch* himself could see that they were properly made.   The only suspicion of any trouble between any of the relatives is manifested by the writer's reference to *Carisch's* wife, but there is no indication that any serious trouble existed between even McKenney and Mrs. Carisch.

On the 17th of April, 1925, *Carisch* promptly replied to this letter, and stated that he would mail the papers as soon as he obtained the statements from Eau Claire (meaning the hospital, doctors' and nurse's charges).   These bills had been paid and the moneys advanced by *Carisch*.   He further stated that he would mail them just as soon as he obtained these statements, which would be Monday or Tuesday.   The letter then proceeds:

"I think this is the best way to handle this since this trouble came up while you were here, as then I will mail you the bills from here and you can pay them and in that way keep track of it yourself, or you can have the bank do it for you.   *Will mail you this just as soon as I get the statements from Eau Claire.*"   (Italics ours.)

The *Carisch* letter recognizes that Mr. McKenney is entitled to his papers.   It also affirms *Carisch's* testimony wherein he testified that the papers were delivered to him for safe-keeping, and that the purpose of his possession of the note was to indorse thereon the moneys expended for Mrs. McKenney; and it further indicates strongly that *Carisch's* possession was a lawful one.

The facts thus far referred to do not support a reasonable inference that *Carisch* either obtained possession of these documents wrongfully, or that he withheld them as the agent of Mrs. McKenney.   The undisputed evidence in the case is to the effect that *Mr. Carisch* was not aware of the serious illness of Mr. McKenney until a few days prior to his death,

when he received a letter from the nurse informing him of that fact.

On the 25th day of April, Mr. Jones, who acted as attorney for Mr. McKenney in drawing his will, at the request of the latter wrote *Carisch* the following letter:

"Mr. E. B. Carisch, River Falls, Wisconsin.
"Dear Sir: Mr. J. H. McKenney has asked me to write you concerning the papers which you hold for safe-keeping. He states that he has requested you to return them to him but you have evidently overlooked the matter. The papers, I think, consist of a deed, a note, and an insurance policy. Will you kindly send these papers by return mail and oblige,
    "Yours very sincerely,    J. REESE JONES."

To this letter *Mr. Carisch* promptly replied on the 27th of April, 1925, as follows:

"Attorney J. Reese Jones, Osseo, Wisconsin.
"Dear Sir: Your letter of the 25th received in regard to Mr. McKenney's papers that he left with me for safe-keeping. About the same time that I got your letter I received a telephone call that Mr. McKenney had passed away. For that reason I am not sending the papers at the present time, but will hold them and turn them over to the administrator.
    "Yours truly,    E. B. CARISCH."

The testimony also shows that at or about the time of McKenney's death *Mr. Carisch* had received all of the bills incurred for Mrs. McKenney's medical attendance and was ready to send the documents to McKenney, when he was informed of the latter's death.

The foregoing comprises substantially all the evidence which has a bearing upon questions number 3, 4, and 5 of the special verdict, and upon which the answers to such questions must be sustained if the jury's verdict is permitted to stand. From this testimony, and particularly the written communications above referred to and set forth, the conclusion is irresistible that *Carisch* did not act as Mrs. McKen-

ney's agent in withholding the certificate.    Nor can it logically be inferred therefrom that the withholding of the certificate prevented the issuance of a new one before the death of Mr. McKenney.    The trial court, therefore, was fully justified in changing the answers of the jury in the respects above indicated.

In *McGowan v. Supreme Court of Independent Order of Foresters,* 104 Wis. 173, 180, 80 N. W. 603, the rule, which is in accordance with universal authority, is stated as follows:

"It is now well settled that one who is insured in a mutual benefit association, and who wishes to change the beneficiary, must make the change in the manner required by his policy and the rules of the association, and that any material deviation from this course will render the attempted change ineffective."

The rule thus laid down is recognized by plaintiff's counsel, but he argues that the insured in signing Form No. 7½ has substantially complied with the provisions of the by-laws, and that in failing to issue a new certificate in accordance with the insured's request the society failed to perform a mere ministerial duty, and that inasmuch as the insured had done everything in his power which he could have done, equity will consider that done which ought to be done, and that therefore a change in the beneficiary should have been decreed.

The rules and regulations of a mutual benefit society which designate the manner in which a change in beneficiary under a certificate shall be accomplished are for the benefit and protection of the society.    The society has seen fit in the instant case not only to provide in its by-laws for provisions for a change of beneficiary, but has also specified and incorporated therein certain forms which are applicable and suitable to meet any situation which may arise.    When the deceased became a member he agreed not only to abide by

the by-laws then in force but by those which might be enacted at any time thereafter. The forms in question were adopted to promote a system in the organization. They were drafted by those experienced in fraternal insurance; were based upon experience; and were designed not only to further the administrative policy of the society but for its protection. Where an order like the Woodmen, which in the course of its operations has spread over the entire country, and which is primarily designed for the benefit and relief of the dependents or near relatives of the insured, provided by its by-laws for certain definite steps to be pursued in order to effectuate a change of beneficiary, such by-laws must be construed largely in accordance with the fundamental spirit which has created the order and which maintains it, and therefore we must assume that such rules and regulations are necessary and proper in order that the objects and purposes of the order may be attained and promoted.

An examination of the Reports pertaining to cases brought to recover on benefit certificates discloses that at an early date few, if any, by-laws were enacted prescribing how a change of beneficiary may be wrought. Many cases in our own Reports evidence this fact. However, in the course of time experience has taught that certain protective features were necessary, and therefore it has been the tendency of all societies of this kind to prescribe certain rules and regulations and to add to them as necessity required, and such changes invariably are based upon actual experience. The Woodmen, therefore, in its by-laws provided for three separate and distinct situations: (1) Where a change in beneficiary is desired and where the insured has in his possession the certificate, and in such case the only requisite consists of the surrender of the certificate with a proper indorsement thereon. (2) Where the insured is a member in good standing and has lost his certificate, or where it is not in his possession or control, and a change of beneficiary

is desired, the use of Form No. 7 is prescribed. This form contains certain provisions to which the insured is required to subscribe, and which are designed for the protection of the society upon issuance of a new certificate. (3) Where the certificate of a member has lapsed and where he has not the possession or control of the certificate, Form No. 7½ was prescribed and adopted, and the application pursuant to such form provides not only for a reinstatement of the certificate, but also contains certain other provisions for the protection of the society. In the instant case Form No. 7 was the proper form. Instead of using this form, both the local clerk of the camp and the insured saw fit to use Form No. 7½. The form used contains a number of statements which were untrue. It did, however, contain a waiver of liability under the old certificate, and in this respect did not differ substantially from the waiver contained in Form No. 7.

In the form used, this material agreement, which is contained in Form No. 7, was entirely missing:

"In the event the Modern Woodmen of America should suffer loss by reason of any claim made under any benefit certificate heretofore issued to me, I agree that said Modern Woodmen of America may reserve and retain a sufficient sum from the amount due any beneficiary or beneficiaries, under any benefit certificate hereafter issued to me and in force."

This provision clearly was not applicable to an application where Form No. 7½ was used, for that form contemplated a lapsed certificate, where all liability of the association had come to an end. This feature, therefore, contained in Form No. 7 (which was the proper form) constituted a vital protective feature under which, by the agreement of the insured, the association could recoup itself for any damages sustained in the event that the lost certificate was transferred to a third party. Under these circumstances it cannot be said

that the member has substantially complied with the by-laws of the association; and, regardless of all other improper statements contained in the form used, amply justified the head clerk in refusing to recognize the application. And it requires no argument to demonstrate that if the head clerk had done otherwise his act would be a clear violation not only of his duty to the association but of the by-laws.

The *McGowan Case, supra,* is not an authority in favor of the doctrine advanced by plaintiff's counsel. In the *McGowan Case* it was held that:

"The insured had done every substantial act required of him by the terms of the policy and the rules of the society in order to make a complete change of beneficiaries. The last act was the surrender to the deputy chief ranger of the original certificate, at least one day before his death. He could do nothing further. On the part of the society there were simply formal acts to be performed. There was no discretion as to whether the society would allow the change. It is true the rules say that the change shall be made and a new certificate issued if the application be approved by the supreme chief ranger, but this approval plainly relates to matters of form only. It was the right of the insured to make the change before his death *if he took the required steps,* and if the new beneficiary was competent to be such under the rules of the order." Page 181.

Defendant's counsel do not take issue with the doctrine of the *McGowan Case* as above quoted; in fact, expressly concede it. The distinction between the facts in the *McGowan Case* and the instant case is so plain and apparent as to require no further comment.

In the case of *Waldum v. Homstad,* 119 Wis. 312, 96 N. W. 806, cited in plaintiff's brief, a situation similar to that in the *McGowan Case* existed, but in that case the grand secretary unreasonably delayed the issuance of a new certificate, and the holding of the court in that case on the subject now considered was almost in the identical language of the opinion in the *McGowan Case.*

In the case of *Raschke v. Haderer,* 138 Wis. 129, 119 N. W. 812, the insured had substantially complied with all the by-laws and rules of the association, and a new certificate was duly issued to him accordingly, and the fact that the original certificate had not been lost, as was represented in the application, but had been secreted by the wife, did not affect the rights of the beneficiaries named in the new certificate, there being no question that the insured desired the change.

In the case of *Faubel v. Eckhart,* 151 Wis. 155, 138 N. W. 615, as will appear by paragraph 5 of the syllabus, it is said:

"Although the insured may be equitably bound by a contract to exercise his power of appointment and change the beneficiaries, yet if he fails to execute that power equity cannot regard it as done, since to do so would nullify the rule that a change of beneficiary must be made conformably to the regulations of the association."

*Berg v. Damkoehler,* 112 Wis. 587, 88 N. W. 606, was an action brought to recover under a life insurance policy, and the insured had the right to change the beneficiary by filing with the company a written request *duly acknowledged,* accompanied by the policy. In that case all of the requirements of the company were complied with, excepting only that the application was not acknowledged. A new application with instructions was thereupon sent to the insured, which was not executed, on account of the death of the insured. In that case the court held that the unacknowledged application was not a substantial compliance with the provisions of the policy. In the opinion in that case it is said:

"The unacknowledged request was not in compliance with the requirements of the policy. The company refused to recognize it. The proper authentication of the written request was of importance to all concerned. It was material because made so by the contract. It was a protection to the company as against payment to persons who might fraud-

ulently secure possession of the policy. It was a safeguard of the insured and his beneficiary for the same reason." Citing *Mellows v. Mellows,* 61 N. H. 137; *Rollins v. McHatton,* 16 Colo. 203, 27 Pac. 254; *Grand Lodge v. Fisk,* 126 Mich. 356, 85 N. W. 875.

When the insured did not receive his certificate in time to surrender it, together with an indorsement thereon, he elected to pursue another course. Ample opportunity and time were available to him to have a change of beneficiary effected under the method pursued by him. That the new certificate was not issued was not the fault of the company, or of Mrs. McKenney, or of *Mr. Carisch,* but was due to the oversight and neglect of both the local clerk and the insured.

But it is further argued by counsel for the plaintiff that the association, upon suit being brought by the plaintiff, paid the money into court; that the association thereafter was no longer interested as to who of the two rival claimants was decreed to be the beneficiary; and that therefore, as between such claimants, the court, sitting as a court of equity, should have decided the issues in favor of the plaintiff for the reason that he held the superior equities. Prior to the death of the insured there were but two parties interested, viz. the insured and the association; and such interest sprang from the contract relations between them. The insured was authorized under the by-laws to effect a change of beneficiary by the power of appointment of a new beneficiary. Up to the time of the death of the insured the beneficiary named in the certificate had no interest therein unless it was an inchoate interest, which might ripen into a vested one upon the death of the insured. Therefore, regardless of the form of the request of the insured for a change of beneficiary, it was at all times within the power of the association to waive any of the rules and regulations and to issue a new certificate; and had this been done, the original beneficiary would

have no cause for complaint. So that, while the association in the instant case might have recognized the application made upon Form No. 7½ and issued its new certificate, which would have precluded the original beneficiary, nevertheless it did not deem fit to do so; and in taking the course it did the association acted fully within its rights. Up to this stage the association waived nothing, and it is difficult to comprehend a form of logic which holds that the association waived its rights, after the death of the insured, by paying the money into court and by praying the court to determine who of the two claimants is rightfully entitled to the proceeds of this benefit certificate. Upon the death of the insured the right of a beneficiary became vested. The inchoate right which existed during the lifetime of the insured became transformed into an absolute and vested right, which the association could not modify or change even if it so desired. As is said in the *McGowan Case,* there was either a change of beneficiary or there was not. It is true that a court of equity will recognize certain equities existing between the parties, such as appeared in the *McGowan* and subsequent cases. In a case where the insured had done everything within his power to effect a change of beneficiary, under the equitable doctrine that a court of equity will consider that done which ought to be done, it will decree a change as wrought where the only requirement unperformed consists of the performance of a formal, ministerial act on the part of the association. This would likewise apply to a case where the association for an unreasonable length of time failed or neglected to properly respond to a formal application for a change of beneficiary; where the association or its officers act in collusion with one of the beneficiaries; and where the by-laws provide that a change of beneficiary can only be effected by a surrender of the original certificate with a proper indorsement thereon, and the original beneficiary wrongfully or fraudulently abstracts the

certificate from the owner and withholds it from him. Such are the equitable grounds upon which a court of equity, in a proper case, will decree that done which ought to have been done, and such is the ruling of this court in the cases above cited.

In a learned and exhaustive opinion in the case of *Modern Woodmen v. Headle,* 88 Vt. 37, 90 Atl. 893, L. R. A. 1915 A, 580, it is said:

"It is also said that it waived the provisions of the by-laws by paying the fund into court and asking that the adverse claimants be required to interplead. By the great weight of authority the society cannot be regarded as having waived the requirement of the by-laws by bringing the bill of interpleader and paying the fund into court. By so doing the society admitted its liability under one or the other of the certificates, and asked the court of chancery to protect it by determining the conflicting rights of the claimants; but it cannot be held that the rights of either claimant are prejudiced thereby. The rights of the parties became fixed at the moment of the death of the insured member, and the society was powerless to do anything to affect vested rights. They are controlled by the contract as it was at that time."

The ruling in the *Headle Case* is in conformity with the rule laid down by this court in the *Berg,* the *McGowan,* and the *Faubel Cases, supra.*

No useful purpose could be served by extending this opinion. The effect of the provision of the by-laws heretofore quoted and which reads as follows: "No change of beneficiary shall be effective until a new certificate shall have been issued in the lifetime of the member, and until such time the provisions of the old certificate shall remain in force," is not determined in this opinion. This provision is also contained in the certificate in the *Headle Case* and is exhaustively treated therein. This provision adopted by mutual benefit societies is a new one of recent origin, and the effect of the same has not been generally determined by

the courts; and we therefore reserve a decision upon this provision for the future.

We therefore conclude that the beneficiary in the certificate was not changed, and that the judgment of the lower court must be affirmed.

*By the Court.*—Judgment affirmed.